**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KISHAN SHAH, derivatively on behalf of FLY-E GROUP, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ZHOU OU, SHIWEN FENG, LUN FENG, BIN WANG, and ZANFENG ZHANG,<br><br>Defendants,<br><br>and<br><br>FLY-E GROUP, INC.,<br><br>Nominal Defendant. | Case No.: 1:25-cv-06372<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Kishan Shah ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Fly-E Group, Inc. ("Fly-E" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Zhou Ou ("Ou"), Shiwen Feng ("S. Feng"), Lun Feng ("L. Feng"), Bing Wang ("Wang"), and Zanfeng Zhang ("Zhang"), (collectively, the "Individual Defendants," and together with Fly-E, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Fly-E, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and against Defendants Ou and S. Feng for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges

the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fly-E, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Fly-E's current and/or former directors and officers from July 15, 2025 through August 14, 2025, both dates inclusive (the "Relevant Period").

2. Fly-E is a Delaware corporation headquartered in Flushing, New York engaged in the business of electric vehicles ("EVs"). The Company's chief operations include the development, installation, and sale of electronic motorcycles ("E-motorcycles"), electric bikes ("E-bikes"), and electric scooters ("E-scooters"). The Company also sells accessories related to such products. The Company's products noted above are sold under the brand name "Fly E-Bike."

3. As of July 15, 2025, the Company's product line included 27 E-motorcycle products, 36 E-bike products, and 38 E-scooter products. The Company opened its first store in New York in 2018. As of July 15, 2025, the Company operates 20 retail stores, comprised of 19 stores in the United States and one store in Canada.

4. Throughout the Relevant Period, the Individual Defendants continued to represent that the Company's products, in particular the lithium batteries utilized in such products, were safe

and popular with consumers. As such, the Individual Defendants conveyed to investors their confidence in the Company's growth and overall financial prospects.

5. However, unbeknownst to investors, the lithium batteries present in the Company's EVs posed significant safety concerns to consumers, particularly with regard to an increased risk of fires. As such, the Company's EVs are alleged to have caused multiple deadly fires in New York City and the surrounding region.

6. Nevertheless, the Individual Defendants maintained their belief in the safety of the Company's lithium batteries and its financial prospects. For instance, the Company issued a press release to announce its financial results for the fiscal year ended March 31, 2025,[1] which it also filed as a Current Report on Form 8-K with the SEC on July 15, 2025 (the "FY 2025 Press Release"). The Company stated in the FY 2025 Press Release that "***[w]e believe our continued investment in safety, service, and innovation will prepare Fly-E for sustained long-term growth***."[2]

7. The truth emerged on August 14, 2025, when the Company filed a Form NT 10-Q, announcing it an inability to timely file the Form 10-Q with the SEC for the first quarter of the 2026 Fiscal Year (the "August 2025 NT 10-Q"). In addition to reporting a 32% decline in the Company's net revenue as compared to the same period in 2024, the August 2025 NT 10-Q cited as a primary factor an "increasing number of lithium-battery explosion incidents in New York."

---

[1] Fly-E's fiscal year does not mirror the calendar year, but instead starts on April 1 and ends on March 31 each year.
For the period between April 1, 2024 and March 31, 2025, the "2025 Fiscal Year."
For the period between April 1, 2025 and March 31, 2026, the "2026 Fiscal Year."

[2] Unless otherwise stated, all emphasis is added.

8. On this news, the price per share of the Company's common stock fell $6.76, or roughly 87.1%, from a price per share of $7.76 at the close of trading on August 14, 2025 to close at $1.00 on August 15, 2025.[3]

9. In breach of their fiduciary duties, the Individual Defendants caused and/or permitted Fly-E to sell products which they knew, or were highly reckless in not knowing, were unsafe. Specifically: (1) the Company's lithium batteries lacked the safety certification required by New York City law; (2) the Company's lithium batteries were of substandard quality; (3) as a result of the poor quality of the Company's lithium batteries, the risk of an electrical fire developing from the Company's products greatly increased; and (4) as a result of the foregoing, the Company's lithium batteries resulted in multiple deadly fires in the greater New York City area (collectively, the "Lithium Battery Misconduct").

10. In addition, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Fly-E, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaging in the Lithium Battery Misconduct; (2) in light of the Lithium Battery Misconduct, the Individual Defendants created a false impression about the Company's projected revenue outlook and product expansion; (3) the Lithium Battery Misconduct resulted in a sharp decline in sales revenue and increased operating expenses; and (4) as a result of the Lithium Battery Misconduct and ensuing negative impact on the Company's financial metrics, the Company was unable to timely file its Form 10-Q for the first quarter of the

[3] The Company effected a 1:20 reverse stock split on November 4, 2025. The stock prices reported all reflect the Company's stock price from before this reverse stock split.

2026 Fiscal Year. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

11. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. In light of the Individual Defendants' misconduct—which has subjected the Company; its founder, Chief Executive Officer ("CEO") and Chairman of the Board; and its former Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Ou and S. Fengs' liability in the Securities Class Action, and of their not being disinterested or independent directors, a majority of the Board cannot

consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the

Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

22. Plaintiff is a current shareholder of Fly-E. Plaintiff has continuously held Fly-E common stock at all relevant times.

23. Plaintiff is a citizen of Canada.

### Nominal Defendant Fly-E

24. Fly-E is a Delaware corporation with its principal executive offices at 136-40 39th Avenue, Suite 202, Flushing, New York 11354. Fly-E shares trade on the NASDAQ Stock Market LLC ("NASDAQ") under the ticker symbol "FLYE."

### Defendant Ou

25. Defendant Ou is the Company's founder, and has served as the Company's CEO and Chairman of the Board since 2018. Additionally, Defendant Ou served as the Company's interim CFO from August 26, 2025 to September 17, 2025.

26. The Form 424B4 the Company filed with the SEC on June 2, 2025 (the "2025 Prospectus") stated the following about Defendant Ou:

> Mr. Ou founded Fly E-Bike in 2018 and has since served as our Chairman of the Board and Chief Executive Officer ("CEO"). Before founding Fly E-Bike, Mr. Ou operated a motorcycle repair business for over eight years, and previously held a managerial position at a food delivery company. We believe that Mr. Ou's prior experience in the motorcycle industry and his understanding of the delivery industry, combined with his tenure at our company, qualifies him to serve as our Chairman of the Board.

27. Upon information and belief, Defendant Ou is a citizen of New York.

### Defendant S. Feng

28. Defendant S. Feng served as the Company's CFO and as a Company director from November 2024 to August 20, 2025.

29. The 2025 Prospectus stated the following about Defendant S. Feng:

> Ms. Feng has served as our Chief Financial Officer and a director since November 2024. Ms. Feng is an experienced financial professional with a background in corporate finance, corporate tax management, and project oversight. From October 2021 to October 2024, Ms. Feng served as the manager at PJMG LLC, a consulting services company, where she was responsible for overseeing financial planning, managing corporate structuring, and ensuring compliance with financial regulations. Prior to that, from September 2019 to July 2021, Ms. Feng worked at DGLG Accounting & Tax LLC, an accounting and financial consulting company, first as a staff member assisting with corporate formations, tax compliance, and payroll management, and later as a manager, focusing on financial reporting, monthly bookkeeping, and corporate tax filings. She earned her Master's degree in Accounting from the Frank G. Zarb School of Business at Hofstra University in 2020 and her Bachelor's degree in Accounting from Henan University in China in 2019. Ms. Feng was selected to serve as a member of our board of directors because of her experience in the financial services industry.

30. Upon information and belief, Defendant S. Feng is a citizen of New York.

**<u>Defendant L. Feng</u>**

31. Defendant L. Feng served as a Company director from May 14, 2024 to August 21, 2025.

32. The 2025 Prospectus stated the following about Defendant L. Feng:

> Mr. Feng has served as a director since June 2024. Since August 2015, Mr. Feng has held the position of executive director at Si Fang Yu Feng Investment Co., Ltd., a Chinese investment management company. From June 2009 to June 2021, he served as the chairman of the board of directors at Beijing Wan Tong Li Ti Zhi Cheng Investment Co., Ltd., a Chinese investment management company. Additionally, Mr. Feng currently serves as an independent director at three public companies listed on the Shanghai Stock Exchange and Shenzhen Stock Exchange. These companies include Bank of Xi'an Co., Ltd., Shanghai Xinnanyang Only Education and Technology Co., Ltd., and Bona Film Group Co., Ltd. Mr. Feng received his bachelor's degree in political economy from Northwest University (China) in 1982. Mr. Feng was selected to serve as a member of our board of directors because of his extensive senior-level management experience of public companies, his board experience and his extensive knowledge of our business and industry.

33. Upon information and belief, Defendant L. Feng is a citizen of New York.

**Defendant Wang**

34. Defendant Wang served as a Company director from May 14, 2024 to October 31, 2025.

35. The 2025 Prospectus stated the following about Defendant Wang:

> Mr. Wang has served as a director since June 2024. Mr. Wang has over 30 years of management experience in the financial industry. He currently serves as the Managing Director of Eon Capital International Ltd, a Hong Kong corporate advisory service company. He has also been a member of the board of directors of Maison Solutions Inc., a Nasdaq-listed company, since 2023. Previously, from 2018 to 2020, Mr. Wang was the Chairman and CEO of Alberton Acquisition Corp., a Nasdaq-listed company. From 2010 to 2012, he served as Independent Board Director in Sky Digital Stores Corp. (OTC: SKYC), participating in the company's public listing process. From 2007 to 2018, Mr. Wang provided corporate advisory services to dozens of corporate clients in the US and Asia. Mr. Wang began his financial career at Chemical Bank in 1994 when he served as a commercial banking manager for the bank's Asian market. From 1996 to 2000, he served as Vice President and Team Leader of Chase International Financial Services, to promote the bank's business in Asia-Pacific region. After Chase merged with JPMorgan in 2000, Mr. Wang continued to work at JPMorgan Chase until late 2006, playing a wide range of management roles in the development and growth of international business. Mr. Wang graduated from Northwestern Polytechnic University in 1980, obtained his Master of Science degree in Mechanical Engineering from Xi'an Jiaotong University in 1983, and earned his Master of Arts degree in economics from Illinois State University in 1992. Mr. Wang was selected to serve as a member of our board of directors because of his extensive senior-level management experience in the financial services industry and his profound knowledge of our business and the industry as a whole.

36. Upon information and belief, Defendant Wang is a citizen of New York.

**Defendant Zhang**

37. Defendant Zhang served as a Company director from August 2024 to August 21, 2025.

38. The 2025 Prospectus stated the following about Defendant Zhang:

> Mr. Zhang has served as a director since August 2024. Mr. Zhang has over 25 years of experience in finance and investment management. Since November 2017, he has served as Managing Director at IDG Capital, an investment and asset management company, where he oversees post-investment management and risk control. From August 2014 to July 2017, Mr. Zhang co-founded and served as the Chief Financial Officer of Beijing Jiufang Rugao Information Technology Co., Ltd., an internet startup providing community-based online-to-offline (O2O) life services and a fresh produce B2C (business-to-consumer) platform, where he oversaw financing activities. Prior to that, he co-founded and served as Chief Operating Officer of Beijing Panteng Technology Co., Ltd., a smart hardware startup, from September 2013 to August 2014, where he secured early-stage funding and led its market expansion. Earlier in his career, Mr. Zhang held senior financial roles at Ruijing Hengtong (Beijing) Investment Consulting Co., Ltd. from July 2008 to August 2013, and at Peugeot China Co., Ltd. from June 2003 to July 2008. Mr. Zhang holds a Master's degree in Business Management from Paris 1 Panthéon-Sorbonne University and a Bachelor's degree in Accounting from East China Jiaotong University. Mr. Zhang was selected to serve on the Board due to his extensive expertise in finance and investment management.

39. Upon information and belief, Defendant Zhang is a citizen of New York.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

40. By reason of their positions as officers and/or directors of Fly-E and because of their ability to control the business and corporate affairs of Fly-E, the Individual Defendants owed Fly-E and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fly-E in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fly-E and its shareholders so as to benefit all shareholders equally.

41. Each director and officer of the Company owes to Fly-E and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

42. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fly-E, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

43. To discharge their duties, the officers and directors of Fly-E were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Fly-E, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Fly-E's Board at all relevant times.

45. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this

Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

46. To discharge their duties, the officers and directors of Fly-E were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fly-E were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Fly-E's own Code of Business Conduct and Ethics ("Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Fly-E conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Fly-E and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fly-E's operations would comply with all applicable laws and Fly-E's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

47. Each of the Individual Defendants further owed to Fly-E and the shareholders the duty of loyalty requiring that each favor Fly-E's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

48. At all times relevant hereto, the Individual Defendants were the agents of each other and of Fly-E and were at all times acting within the course and scope of such agency.

49. Because of their advisory, executive, managerial, and directorial positions with Fly-E, each of the Individual Defendants had access to adverse, non-public information about the Company.

50. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fly-E.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

51. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

52. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

53. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Fly-E was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

54. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fly-E and was at all times acting within the course and scope of such agency.

## FLY-E'S CODE OF BUSINESS CONDUCT AND ETHICS

56. The Company's Code of Ethics applies to "all officers, directors, and employees of the Company" and notes that the Board "is committed to conducting business with the highest ethical and legal standards[.]"

57. Under the heading "Compliance with Laws, Rules, and Regulations," the Code of Ethics states the following:

> A variety of laws apply to the Company and its operations. The Company requires that all Covered Parties comply with all laws, rules, and regulations applicable to the Company, both in letter and in spirit. Although not all Covered Parties are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors or the Compliance Officer. Covered Parties are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules, and regulations and to seek advice when there is any uncertainty. Any violations of laws, rules, and regulations can result in civil and criminal penalties as well as disciplinary action from the Company.

58. Under the heading "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> Covered Parties should always act in the best interest of the Company and not permit outside interests (for example, financial or personal) to interfere with their job duties. The Company prohibits all Covered Parties from using their position with the Company or the Company's relationship with its customers or any other external party with which the Company has a business relationship (each an "External Party," and, collectively "External Parties") for private gain or to obtain benefits for themselves or members of their family.
>
> For purposes of the Code, a potential conflict of interest occurs when a Covered Party's outside interests interfere with (or even appear to interfere with) the Company's interests or the Covered Party's work-related duties. A conflict of interest can occur when a Covered Party is in a position to influence a decision that may result in a personal gain for the Covered Party or a Related Person as a result of the Company's business dealings.

> Any direct or indirect conflict of interest between the Company and any Covered Party is prohibited unless otherwise consented to by the Company. The Covered Party has a responsibility to the Company to disclose any situation that is, or reasonably could be expected to give rise to, a conflict of interest or a situation giving the appearance of a conflict of interest.

59. Under the heading "Honest and Ethical Conduct and Fair Dealing," the Code of Ethics states the following, in relevant part:

> The Company is committed to achieving the highest standards of professionalism and ethical conduct in its operations and activities and expects its Covered Parties to conduct business according to the highest ethical standards of conduct, in addition to complying with all applicable laws, rules, and regulations.
>
> The Company has an interest in maintaining a fair and competitive marketplace and friendly work environment. In order to achieve that standard, the Company expects its Covered Parties to maintain honest and ethical standards dealing with each other and the Company's competitors, as well as when transacting business with External Parties.

60. Under the heading "Reporting with Integrity," the Code of Ethics states the following, in relevant part:

> The Company has an obligation to make and keep books, records and accounts that, in reasonable detail, accurately and fairly reflect the Company's transactions and to maintain tax records and prepare tax returns that comply with applicable laws, rules, and regulations. The Company must also maintain a system of internal accounting controls that meet applicable laws, rules, and regulations, and prepare financial statements in accordance with generally accepted accounting principles and applicable laws, rules, and regulations. All employees who are responsible for any aspect of the Company's internal accounting controls and financial and tax reporting systems (including, but not limited to, the Chief Executive Officer, the Chief Financial Officer, any principal accounting officers, and persons performing similar functions) must conduct themselves using high ethical standards of integrity and honesty, in a manner that allows the Company to meet accounting and legal requirements, and to prepare financial reports and financial statements that are not false or misleading, and that present full, fair, accurate, timely, and understandable disclosure in the Company's periodic reports and other public communications.

61. Under the heading "Interpretation/Waivers," the Code of Ethics states the following:

> Requests for a waiver of a provision of the Code must be submitted in writing to the Compliance Officer for appropriate review, and the Audit Committee will

decide the outcome. Pursuant to its charter, the Audit Committee shall review any conduct of executive officers or directors of the Company that is or may be in violation of the Code. Any waiver approved by the Audit Committee for executive officers and directors and the reason for the waiver will be promptly disclosed to the Company's stockholders, if required by and in accordance with applicable laws, rules, and regulations.

62. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Lithium Battery Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and law.

## FLY-E'S AUDIT COMMITTEE CHARTER

63. The Company's Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

64. Under the heading "Purpose," the Audit Committee Charter states the following, in relevant part:

1. Assist the Board with oversight and monitoring of:

• the Company's accounting and financial reporting processes and the integrity and audit of the Company's financial statements;

• the Company's compliance with legal and regulatory requirements;

• the independent registered public accounting firm engaged the purpose of preparing or issuing an audit report as to the Company's financial statements, or performing other audit, review or attest services for the

> Company (the "independent auditor"), including the independent auditor's qualifications, independence and performance;
>
> • the performance of the Company's systems of internal control over financial reporting and disclosure controls and procedures; and
>
> • the Company's risk assessment, risk management and risk mitigation policies and programs, including matters relating to privacy and cybersecurity, and climate and the environment.
>
> 2. Prepare and approve the Committee report required by the rules of the U.S. Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.
>
> 3. Otherwise carry out the duties and responsibilities set forth in this Charter (the "Charter") and any other responsibilities or duties that the Board may assign to the Committee from time to time.

65. Under the heading "Duties and Responsibilities," in a subsection titled "Financial Reporting," the Audit Committee Charter states the following:

> 2.1 Meet to review and discuss with each of management and the independent auditor:
>
> • the Company's annual audited financial statements, and quarterly unaudited financial statements, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" (and, in each case, related footnotes) prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q with the SEC, respectively, and recommend to the Board whether (a) the audited financial statements and the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" be included in the Form 10-K and (b) the Form 10-K should be filed with the SEC;
>
> • the independent auditor's audit of the annual financial statements and its report thereon;
>
> • the accompanying management letter and any reports with respect to interim periods;
>
> • any significant adjustments, management judgments and accounting estimates and any material changes to the Company's accounting principles (including the selection and application thereof) and disclosure presentations and practices used in preparing financial statements to be filed with the SEC;

> • any significant changes required in the independent auditor's audit plan; and
>
> • other matters that are required to be communicated to, or discussed with, the Committee under PCAOB and SEC rules.
>
> 2.2 Review and discuss with each of management and the independent auditor (i) the Company's earnings press releases, including the content, presentation of information and the use of any "pro forma," "adjusted" or other non-GAAP financial information, prior to public disclosure, and (ii) any financial information and earnings guidance provided to analysts and rating agencies.
>
> 2.3 Consider and review with each of management and the independent auditor:
>
> • significant audit findings during the year and management's responses thereto; and
>
> • any changes required in the planned scope of the audit plan.
>
> 2.4 Prepare and approve the Committee report required to be included in the Company's filings with the SEC.

66. Under the same heading, in the subsection titled "Internal Control over Financial Reporting and Disclosure Controls and Procedures," the Audit Committee Charter also states the following:

> 3.1 Review the adequacy of the Company's internal control over financial reporting and the disclosure controls and procedures designed to ensure compliance with applicable law.
>
> 3.2 Consider and review with the independent auditor the adequacy of the Company's internal controls and any related significant findings and recommendations of the independent auditor together with management's responses thereto.
>
> 3.3 Periodically review with management any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting, any fraud involving any employees who have a significant role in the Company's internal control over financial reporting and any significant changes in internal controls over financial reporting or in other factors that could significantly affect internal controls over financial reporting, including management's responses thereto.

> 3.4 Establish and oversee procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls, auditing, and federal securities laws matters, and for the confidential, anonymous submission by the Company's employees and independent contractors of concerns regarding questionable accounting or auditing matters. The Committee shall periodically review (i) the Company's system for receiving and responding to "whistleblower" complaints related to questionable accounting, auditing and legal and regulatory compliance matters, (ii) the effectiveness of the system for monitoring accounting- or auditing-related compliance with all applicable laws and regulations and (iii) the results of management's investigation and follow-up as to any instances of noncompliance.

67. Under the same heading, in a subsection titled "Oversight of Risk Assessment and Management," the Audit Committee states the following:

> 5.1 Regularly review, discuss with management, and oversee:
>
> • management's programs and policies to identify, assess, manage, mitigate and monitor significant business risks of the Company, including financial, operational, information technology, privacy, security, business continuity, legal, regulatory and reputational risk exposures, including the potential impact of those exposures on the Company's business, financial results, operations, and reputation;
>
> • management's risk assessment, management, mitigation and monitoring decisions, practices and activities, including the steps management has taken to monitor and control the Company's major financial risk exposures; and
>
> • policies and guidelines to govern the process by which risk assessment and risk management are undertaken.
>
> 5.2 Review, discuss with management, and oversee the Company's privacy, information technology and security and cybersecurity risk exposures, including:
>
> • the potential impact of those exposures on the Company's business, financial results, operations and reputation;
>
> • the programs and steps implemented by management to monitor and mitigate any exposures;
>
> • the Company's information governance and information security policies and programs; and

• major legislative and regulatory developments that could materially impact the Company's privacy, data security and cybersecurity risk exposure.

68. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in the Lithium Battery Misconduct and to issue materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

69. Fly-E is a Delaware corporation headquartered in Flushing, New York whose chief operations include the development, installation, and sale of EVs, as well as accessories to such products. Among the Company's most notable products are its E-motorcycles, E-bikes, and E-scooters.

70. As of July 15, 2025, the Company offered 27 E-motorcycle products, 36 E-bike products, and 38 E-scooter products, under the brand name "Fly E-Bike." Also as of July 15, 2025, the Company operates 20 retail locations in the United States and a single retail location in Canada.

71. The Company has stated that it plans to expand its business operations to South America and Europe in the future. In addition to selling its products, the Company provides rental services from certain locations in New York, Toronto, and Los Angeles. The Company also operates an online store for its electric vehicle products and services. The Company has noted that it plans to operate a second online store in the future, prioritizing the sale of gas-powered bikes.

**The Lithium Battery Misconduct**

72. Prior to and throughout the Relevant Period, the Individual Defendants asserted that the lithium batteries utilized in the Company's products were safe. In reality, however, the Company's lithium batteries proved to be a major safety hazard for both customers and bystanders.

73. Specifically: (1) the Company's lithium batteries lacked the safety certification required by New York City law; (2) the Company's lithium batteries were of substandard quality; (3) as a result of the poor quality of the Company's lithium batteries, the risk of an electrical fire developing from the Company's products greatly increased; and (4) as a result of the foregoing, the Company's lithium batteries resulted in multiple deadly fires in the greater New York City area.

74. Despite acknowledging the existence of lithium battery fires and explosions in the New York city area, the Individual Defendants did not report that such incidents were specific to the Company.

***March 2025 UL Solutions Lawsuit***

75. In March 2023, New York City began mandating that e-mobility devices be certified by a third-party certification company.

76. On March 12, 2025, the safety certification company UL Solutions sued the Company in the case captioned *UL LLC v. Fly-E Group, Inc. et al*, Case No. 1:25-cv-01405

(E.D.N.Y.) (the "UL Lawsuit"). More specifically, the UL Lawsuit alleges that the Company is "not [a] UL customer[] and ha[s] never asked UL to test or certify their products."[4] Nevertheless, UL Solutions alleges in its complaint that Fly-E is "among those retailers that began advertising its products as 'UL Certified' without actually having UL certification."[5]

77. The UL Lawsuit was settled on June 6, 2025. As per the terms of the settlement, the Company agreed to pay UL Solutions $1,000,000 and was enjoined and restrained from "committing any other acts reasonably calculated to cause users to believe that Defendants' products are authorized or certified by UL, when in fact such products are not authorized or certified by UL."[6]

**False and Misleading Statements**

***July 15, 2025 Form 10-K***

78. The Relevant Period began on July 15, 2025, when the Company filed its Annual Report on Form 10-K with the SEC reporting its financial results for the 2025 Fiscal Year (the "2025 10-K"). The 2025 10-K was signed by Defendants Ou, S. Feng, L. Feng, Wang, and Zhang. Attached to the 2025 10-K were certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Ou and S. Feng attesting to the accuracy of the 2025 10-K and that the "the financial statements, and other financial information included in this [2025 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

[4] Compl. ¶ 44, *UL LLC v. Fly-E Group, Inc. et al.*, No. 1:25-cv-01405, (E.D.N.Y. Mar. 12, 2025).
[5] *Id.*
[6] Consent J. & Permanent Inj. at 3-4, *UL LLC v. Fly-E Group, Inc. et al.*, No. 1:25-cv-01405, (E.D.N.Y. June 6, 2025).

79. The 2025 10-K noted the Company's "strong brand reputation" for high quality EV products, along with its "innovative, differentiated products and services" which set the EVs apart from competitors.

80. Regarding the Company's strength in the EV industry, the 2025 10-K stated the following, in relevant part:

> **Our Strengths**
>
> ***Early Entry into the Market:*** We entered the EV market early and were able to seize the market opportunities to experience rapid growth. We started our business in 2018 and were able to leverage the potential created by the thriving E-commerce industry. Additionally, the COVID-19 lockdown further amplified the demand for online food and essential item deliveries, creating a favorable environment for the expansion and utilization of EVs, particularly E-bikes, which further accelerated our business growth.
>
> ***Brand Reputation: We have a strong brand reputation for consistent delivery of high-quality EV products and excellent customer service. Our brand and retail stores have become reliable business partners for most food delivery workers, especially in New York City. As a result, they have come to recognize our name and trust our services, establishing a loyal customer base for us.***
>
> ***Innovative Products and Services:*** We continue to offer innovative, differentiated products and services that help set us apart from our competitors. ***Since 2018, we have launched over 67 new products and introduced new versions to our existing products with upgrades to design, motor and battery technology. Additionally, we are developing the Fly E-Bike app, which will be used by customers to better manage and enjoy their riding experience.*** We are also developing the Fly E-Bike Care, an extended warranty program that will provide value-added options for our customers in the near future.

81. Regarding the Company's strategies for growing its business, notably the expansion of its sales networks, the 2025 10-K stated the following, in relevant part:

> Our plan to grow our business using the following key strategies:
>
> ***Enhance our position as a leader in urban mobility: We believe we are one of the leading providers of urban mobility solutions for New York City, particularly for food and package delivery workers.*** We intend to leverage this first mover advantage to continue to solidify our market leadership, by enhancing our brand, continuing to innovate, growing our product and service portfolio and expanding our sales network.

> ***Improve brand recognition: We will maintain our commitment to providing exceptional customer service as a means of further enhancing our brand. We will provide an enhanced shopping experience by effectively managing and upgrading our retail stores. In addition, we plan to open more flagship stores in high-traffic retail locations in New York City and other major cities in the United States to further elevate the quality of our brand messaging. Furthermore, we plan to increase our offerings of accessories, such as introducing more style options to our branded apparel, to further strengthen our customers' connection to Fly E-Bike. We also intend to collaborate with other lifestyle brands across different industries to further promote our brand image.***
>
> ***Continue our innovation:*** We will persist in advancing our product line by incorporating cutting-edge design, optimizing user experience and delivering optimal performance. We are developing our Fly E-Bike app, which we plan to include functions to improve the communication between our customers and our products. Additionally, we plan to launch Fly E-Bike Care in the near future, a service designed to function as an insurance policy and provide customers with continuous maintenance services beyond the manufacturer and battery warranty period.
>
> ***Expand our sales network: We plan to expand our sales network internationally. We intend to enter selected overseas markets that offer identified growth opportunities and favorable government policies, such as South America and Europe. As of July 15, 2025, we operate one store in Canada and 19 retail stores in the United States, spanning across the states of New York, Massachusetts, Maryland, Florida, Washington D.C., California and New Jersey. We also operate one online store at flyebike.com, focusing on selling E-motorcycles, E-bikes and E-scooters, serving customers in the United States.*** In addition, we plan to open a second online store focusing on selling gas bikes in the future.
>
> ***Diversify our service offerings:*** We are planning to broaden our business by leveraging our existing retail stores as logistics hubs for small package delivery. We are currently trying to seek business partners, assemble a delivery team and develop an app for the delivery business.

82. Regarding the Company's financial and operational results for the 2025 Fiscal Year, the 2025 10-K noted a decrease in total units sold, resulting in a 21% decline in net revenue for the year. The 2025 10-K reported that the decrease was due in large part to recent accidents pertaining to lithium batteries in E-Bikes and E-Scooters but notably never identified that Fly-E lithium batteries were involved in the accidents reported. Nevertheless, the 2025 10-K stated that

the Company's EV products are "subject to extensive environmental, safety, and regulations, which include products safety and testing, as well as battery safety and disposal."

83. Regarding the Company's regulatory landscape, the 2025 10-K stated the following, highlighting that the Company's Fly-11 PRO was selected as the official model for eligible food delivery workers by the New York City Department of Transportation, stating in relevant part:

> ***Regulatory Landscape***
>
> ***We operate in an industry that is subject to extensive environmental, safety and other laws and regulations, which include products safety and testing, as well as battery safety and disposal. These requirements create additional costs and possible production delay in connection with the testing and manufacturing of our products.*** We also benefit from environmental regulations in our target markets which include economic incentives to purchasers of EVs and tax credits for EV manufacturers. The Governor of New York State signed a legislative package in July 2024 aimed at raising awareness about the safe use of e-bikes and lithium-ion battery products, prohibiting the sale of non-compliant batteries, requiring safety protocols and training for first responders, mandating operating manuals for e-bike retailers, and improving accident reporting and registration processes for e-bikes and mopeds. ***Additionally, in January 2025, the New York City Department of Transportation launched a $2 million trade-in program, allowing eligible food delivery workers to replace their unsafe e-bikes, e-mobility devices, and batteries with certified, high-quality versions. Our Fly-11 PRO was chosen for the official model of DOT and participates in this program. From January 2025 to June 2025, we participated in this program and completed the delivery of Fly-11 Pro models to our retail partner participating in the program.*** While we expect relevant regulations to provide a tailwind to our growth, it is possible for other regulations to result in margin pressures.

***July 15, 2025 Press Release***

84. On that same day, Fly-E issued the FY 2025 Press Release. In the FY 2025 Press Release, Defendant Ou was quoted as stating the following with regard to the Company's positive growth trajectory, in relevant part:

> Fiscal year 2025 was a pivotal year for Fly-E as we navigated a complex and evolving market landscape. ***We achieved an improvement in gross margin to 41.1%, supported by cost reductions and more favorable pricing obtained from our suppliers, particularly in battery sourcing. We are positive about our growth***

> ***prospects despite the dip in revenue caused by short-term external factors, as we have established solid reputation and continued to invest in marketing and product diversification.*** With a focus on innovation, we now offer a broad and growing product portfolio of over 100 models across E-motorcycles, E-bikes, and E-scooters. Our rental service, which is already active in New York City , Toronto , and Los Angeles , is gaining strong traction, and we are excited to extend it to Miami and other markets in the near future.
>
> . . . Following our successful registered direct public offering in June 2025 , we believe we are well-capitalized to invest in inventory, vehicle production, and working capital. ***Looking forward, we remain focused on improving product safety, expanding our geographic reach, and investing in digital platforms such as the Go Fly app to enhance the customer experience and operational visibility. We believe our continued investment in safety, service, and innovation will prepare Fly-E for sustained long-term growth.***

85. The statements referenced above in ¶¶ 78-84 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company was engaging in the Lithium Battery Misconduct; (2) in light of the Lithium Battery Misconduct, the Individual Defendants created a false impression about the Company's projected revenue outlook and product expansion; (3) the Lithium Battery Misconduct resulted in a sharp decline in sales revenue and increased operating expenses; and (4) as a result of the Lithium Battery Misconduct and ensuing negative impact on the Company's financial metrics, the Company was unable to timely file its Form 10-Q for the first quarter of the 2026 Fiscal Year. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**<u>The Truth Emerges</u>**

***August 14, 2025 Form NT 10-Q***

86. The truth emerged on August 14, 2025, when the Company filed the August 2025 NT 10-Q. The August 2025 NT 10-Q reported a 32% decline in the Company's net revenue as

compared to the same period in 2024. The August 2025 NT 10-Q attributed the revenue decline to a decline in the amount of "total units sold" which in turn derived from an "increasing number of lithium-battery explosion incidents in New York" that negatively impacted consumer interest in the Company's products. The August 2025 NT 10-Q reiterated that the EV industry is "subject to extensive environmental, safety and other laws and regulations, which include products safety and testing, as well as battery safety and disposal."

87. On this news, the price per share of the Company's common stock fell $6.76, or roughly 87.1%, from a price per share of $7.76 at the close of trading on August 14, 2025 to close at $1.00 on August 15, 2025.

## DAMAGES TO FLY-E

88. As a direct and proximate result of the Individual Defendants' conduct, Fly-E has lost and expended, and will continue to lose and expend, many millions of dollars.

89. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its CEO; and its former CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

90. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

91. Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Lithium Battery Misconduct.

92. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

93. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

94. As a direct and proximate result of the Individual Defendants' conduct, Fly-E has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

95. Plaintiff brings this action derivatively and for the benefit of Fly-E to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Fly-E, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

96. Fly-E is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97. Plaintiff is, and has been at all relevant times, a shareholder of Fly-E. Plaintiff will adequately and fairly represent the interests of Fly-E in enforcing and prosecuting its rights, and,

to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

98. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

99. A pre-suit demand on the Board of Fly-E is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendant Ou, Lisa Fan ("Fan"), Leqi Dong, Donperez Hua, and Chun Lin (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

100. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to engage in the Lithium Battery Misconduct and to make false and misleading statements and omissions of material facts. This renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

101. As Board members of Fly-E charged with overseeing the Company's affairs, all of the Directors must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Fly-E, the Directors must have been aware of the material facts regarding the Lithium Battery Misconduct and the negative effects such misconduct would have on the Company's financial prospects.

102. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly caused or permitted Fly-E to engage in the Lithium Battery Misconduct and to issue materially false and misleading statements. Specifically, the Directors caused Fly-E to issue false and misleading statements which were intended to make Fly-E appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

103. Additional reasons that demand on Defendant Ou is futile follow. Defendant Ou is the Company's founder, and has served as the Company's CEO and Chairman of the Board since 2018. Additionally, Defendant Ou served as the Company's interim CFO from August 26, 2025 to September 17, 2025. The Company provides Defendant Ou with his primary occupation, for which he is handsomely compensated. Thus, as the Company admits, he is not an independent director. As the Company's CEO throughout the Relevant Period, Defendant Ou is ultimately responsible for the Company's engagement in the Lithium Battery Misconduct and all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he personally made in the 2025 10-K and the FY 2025 Press Release. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the schemes to participate in the Lithium Battery Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Ou is a defendant in the Securities Class Action. For these

reasons, too, Defendant Ou breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

104. Additional reasons that demand on Director Fan is futile follow. Director Fan is neither disinterested nor independent, and therefore, is incapable of considering demand because she, as the Company's CFO, is an employee of the Company, and thus derives substantially all of her income from her employment with Fly-E, thereby rendering her not independent. As such, Director Fan could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Director Fan is therefore futile.

105. Additional reasons that demand on the Board is futile follow.

106. All the Directors breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Directors may not be indemnified for breaching the duty of candor. As a result, all the Directors face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

107. In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in the Lithium Battery Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical

manner. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

108. The Directors' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

109. The acts complained of herein constitute violations of fiduciary duties owed by Fly-E's officers and directors, and these acts are incapable of ratification.

110. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Fly-E. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Fly-E, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

111. If there is no directors' and officers' liability insurance, then the Directors will not cause Fly-E to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

112. Thus, for all the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
## Against the Individual Defendants for Breach of Fiduciary Duties

113. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

114. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fly-E's business and affairs.

115. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

116. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fly-E.

117. In breach of their fiduciary duties owed to Fly-E, the Individual Defendants participated in and/or caused the Company to participate in the Lithium Battery Misconduct.

118. In breach of their fiduciary duties owed to Fly-E, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading

statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was engaging in the Lithium Battery Misconduct; (2) in light of the Lithium Battery Misconduct, the Individual Defendants created a false impression about the Company's projected revenue outlook and product expansion; (3) the Lithium Battery Misconduct resulted in a sharp decline in sales revenue and increased operating expenses; and (4) as a result of the Lithium Battery Misconduct and ensuing negative impact on the Company's financial metrics, the Company was unable to timely file its Form 10-Q for the first quarter of the 2026 Fiscal Year. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

119. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

120. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

121. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

122. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fly-E's securities.

123. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fly-E's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

124. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

125. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fly-E has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

126. Plaintiff, on behalf of Fly-E, has no adequate remedy at law.

## <u>SECOND CLAIM</u>
## Against Individual Defendants for Unjust Enrichment

127. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

128. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fly-E.

129. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Fly-E that was tied to the performance or artificially inflated valuation of Fly-E, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

130. Plaintiff, as a shareholder and a representative of Fly-E, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

131. Plaintiff, on behalf of Fly-E, has no adequate remedy at law.

**THIRD CLAIM**
**Against Individual Defendants for Waste of Corporate Assets**

132. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

133. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Fly-E to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

134. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

135. Plaintiff, on behalf of Fly-E, has no adequate remedy at law.

**FOURTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

136. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Fly-E in a manner consistent with the operations of a publicly held corporation.

138. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Fly-E has sustained and will continue to sustain significant damages.

139. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

140. Plaintiff, on behalf of Fly-E, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Abuse of Control**

141. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Fly-E, for which they are legally responsible.

143. As a direct and proximate result of the Individual Defendants' abuse of control, Fly-E has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

144. Plaintiff, on behalf of Fly-E, has no adequate remedy at law.

## SIXTH CLAIM

**Against Defendants Ou and S. Feng for Contribution Under Sections 10(b) and 21D of the Exchange Act**

145. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146. Fly-E and Defendants Ou and S. Feng are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Ou's and S. Feng's willful and/or reckless violations of their obligations as officers and/or directors of Fly-E.

147. Defendants Ou and S. Feng, because of their positions of control and authority as officers and/or directors of Fly-E, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Fly-E, including the wrongful acts complained of herein and in the Securities Class Action.

148. Accordingly, Defendants Ou and S. Feng are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

149. As such, Fly-E is entitled to receive all appropriate contribution or indemnification from Defendants Ou and S. Feng.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Fly-E, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Fly-E;

(c) Determining and awarding to Fly-E the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Fly-E and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Fly-E and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;
2. a provision to permit the shareholders of Fly-E to nominate at least three candidates for election to the Board; and
3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations;

(e) Awarding Fly-E restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: November 17, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Kishan Shah, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17__ day of November, 2025.

DocuSigned by:



B69EEB1CFF4645C...

Kishan Shah